Upon review of the competent evidence of record with respect to the errors assigned, and finding no good grounds to receive further evidence or rehear the parties or their representatives, the Full Commission, upon reconsideration of the evidence, affirms the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. All the parties are properly before the Industrial Commission and the Industrial Commission has jurisdiction of the parties and the subject matter herein. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employment relationship existed between plaintiff and defendant-employer at all relevant times.
3. Aetna Casualty Surety Co. was the workers' compensation carrier on the risk at all relevant times.
 ***********
Based upon all of the competent evidence adduced from the record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was fifty-two years old at the time of the hearing before the Deputy Commissioner. She completed the eighth grade. She started working for defendant-employer in 1977.
2. Plaintiff's initial job for defendant-employer consisted of assembling clocks, which consisted of placing the movements into clocks. After leaving that position, plaintiff spent a few days packing completed clocks into boxes and placing them onto a lift. From there, plaintiff spent twelve years working in "fit-ups" where she put coils into the clock movements by tying the coil into a knot and connecting it to the movement, then placing the movement into the clock body.
3. Plaintiff's next job involved working on "the big machine," putting dials on clocks. Plaintiff had to use pressure to place the dial onto a clock, but there was no indication of how much pressure was required. She placed dials on between 1100 and 1700 clocks per hour, and worked from eight to ten hours per day. Occasionally, plaintiff worked in "tear downs," which involved breaking down clocks with bad working parts. In this position, plaintiff was required to lift boxes of clocks which caused pain in her hands and wrists. Plaintiff was given thirty minutes for lunch and a fifteen minute break each morning and afternoon.
4. Plaintiff began having problems with her right thumb and presented to Dr. Theodore Rogers. Dr. Rogers referred plaintiff to Dr. Donald K. Bynum. On 17 February 1993, plaintiff presented to Dr. Bynum with left wrist pain which she contended had been present for approximately one year. She further stated that she had been experiencing pain in her right thumb for several years. Dr. Bynum's examination revealed that plaintiff's right thumb was swollen at the MP joint, the thumb had crepitus and was unstable over the ulnar collateral ligament. Plaintiff's left wrist was tender and swollen over the dorsal ulnar aspect, with pain over the head of the ulnar. Lastly, plaintiff had a "mass" along the dorsal ulnar, which an MRI later determined to be a fluid-filled area representing either a ganglion or interarticular fluid. The MRI also showed a probable tear of cartilage in the corner of plaintiff's wrist.
5. Dr. Bynum next saw plaintiff on 29 March 1993, at which time the thumb pain had resolved. Plaintiff still had the fluid mass on her wrist, and an attempt to draw the fluid out was unsuccessful.
6. Arthroscopic surgery was performed on the wrist on 7 May 1993. The surgery revealed some instability in the wrist, but no fibrocartilage tear as suggested by the MRI. A post-surgery note dictated on 20 May 1993 diagnosed plaintiff with instability of the lunotriquetral joint, hypertrophic synovitis, defined as inflammation and irritation of the joint lining, and mild instability of the distal radial ulnar joint. Dr. Bynum testified that these findings are typically the result of trauma rather than attrition, and that the absence of rheumatoid arthritis in plaintiff's case indicated that her condition was due to a post-traumatic event. For further treatment of the wrist's instability, Dr. Bynum recommended limited fusion surgery as opposed to ligament reconstruction.
7. Plaintiff returned to Dr. Bynum for an additional post-operative follow-up on 7 October 1993. At that time, plaintiff complained of a recurrence of pain in her right thumb. Plaintiff had not worked for defendant-employer since 6 May 1993, the day prior to her wrist surgery. Dr. Bynum testified that plaintiff's thumb showed some slight volar subluxation, or partial displacement, of the proximal phalanx with severe grinding, crepitus and pain. Dr. Bynum gave plaintiff a five percent permanent partial disability rating for her wrist. He wrote plaintiff out of work because of the plan to operate on the thumb later in the month, but stated that for purposes of her wrist, she could return to work.
8. Dr. Bynum stated that he could not relate plaintiff's thumb problems to her job without knowing how much pressure plaintiff was required to place on her thumb or how much torque was involved in order to accomplish her job.
9. On 26 October 1993, Dr. Bynum performed a fusion of plaintiff's right thumb metacarpal phalangeal joint. The joint showed eburnated bone on the metacarpal head with full thickness cartilage loss over seventy-five percent of the articular surface. In follow-up examinations through 27 January 1994, Dr. Bynum's notes indicated that plaintiff's thumb was healing according to schedule and without difficulty. As of 27 January 1994, Dr. Bynum suggested to plaintiff that she should be ready to return to work in one month.
10. On 3 March 1994, plaintiff returned to Dr. Bynum with complaints of pain in multiple areas of her right hand and her left knee. She told Dr. Bynum that she was not going to return to work but was pursuing social security benefits. During the course of the examination, Dr. Bynum believed plaintiff was emphasizing her right hand pain, and the locales of alleged pain did not correspond to any particular joint. He further testified that on that day the arthrodesis was healed and that plaintiff could return to work using her hand without restriction. Although he did not perform a functional capacity examination, Dr. Bynum believed that plaintiff could perform work that involved gripping or pinching up to ten pounds at a minimum.
11. Dr. Bynum set up a separate evaluation date for plaintiff's knee, which he suspected was arthritic in origin. Because of plaintiff's left knee pain, Dr. Bynum felt that plaintiff could at least return to sedentary work which did not require her to be on her feet all day.
12. Dr. Bynum believed that plaintiff's knee problems were unrelated to her work, but were the result of degenerative arthritis; that plaintiff's left wrist condition was most likely the result of one or two specific traumatic events as opposed to long-term occupational overuse; and that plaintiff did not have carpal tunnel syndrome. He also stated that plaintiff's right thumb condition could have been caused by her occupation, but his statement was based solely upon a hypothetical in which it was assumed that plaintiff was required to push an insert onto a clock with her thumb using "not miniscule" force approximately 420 times per day continually for a period of ten years.
13. Given that plaintiff's thumb pain resolved between February 1993 and March 1993 and recurred when plaintiff had not been working for several months; that Dr. Bynum noted an emphasizing of pain on plaintiff's part when he examined her right hand joints; that the hypothetical upon which Dr. Bynum relied in reaching his conclusions regarding possible causation contained facts not in evidence, including the representation that plaintiff's use of the thumb in her work was continual and uninterrupted by other tasks; and that there was no evidence presented regarding the amount of force required by plaintiff in using her thumb at work, there is insufficient evidence to demonstrate a causal connection between plaintiff's thumb condition and the conditions of her employment.
14. Plaintiff subsequently presented to Dr. Michael N. Brown who was unable to relate plaintiff's current condition to employment factors which had occurred significantly earlier.
15. On 29 August 1994, plaintiff presented to Dr. Fred D. McQueen, Jr. Dr. McQueen did not review Dr. Bynum's records and mistakenly believed that he had operated on plaintiff for carpal tunnel syndrome.
16. The undersigned places greater weight on the testimony and opinion of Dr. Bynum.
 ***********
Based on the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiff failed to show by the greater weight of the evidence that her conditions are occupational diseases as defined by the Act. N.C. Gen. Stat. § 97-53(13).
2. Plaintiff failed to show that her synovitis was caused by trauma in her employment. N.C. Gen. Stat. § 97-53(20).
3. Plaintiff is not disabled as a result of an occupational disease and is not entitled to compensation for an occupational disease under the Act. N.C. Gen. Stat. § 97-52.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following
 AWARD
1. Plaintiff's claim for benefits under the Workers' Compensation Act is hereby DENIED.
2. Each side shall bear its own costs.
 S/ _____________ RENÉE C. RIGGSBEE COMMISSIONER
CONCURRING:
S/ _____________ LAURA K. MAVRETIC COMMISSIONER
S/ _____________ THOMAS J. BOLCH COMMISSIONER
RCR:jbd